The New-York and New Haven R. R. Company *v.* Schuyler, Cross, &c.

The court reserved its opinion upon the question whether the services of the relator were of such a character as to come within the statute requiring advertisement and contract with the lowest bidder, putting the judgment upon the other grounds stated.

Judgment reversed and mandamus denied.

---

## THE NEW-YORK AND NEW HAVEN RAILROAD COMPANY *v.* ROBERT SCHUYLER, WILLIAM CROSS and 324 others.

Spurious certificates of stock in a railroad corporation, issued by the officer having apparent authority to do so, undistinguishable upon their face from the certificates of genuine stock, and outstanding in the hands of numerous holders as evidences of interests in the property of the corporation, are clouds upon the title of the genuine stockholders which a court of equity will remove.

The corporation may institute a suit for this purpose, not, it seems, as a trustee of the property and funds under its control, asking advice and aid for its own benefit, but as the representative of the genuine stockholders and in their behalf.

The false certificates having a common origin and common ground of invalidity, the holders, although they become such under different circumstances and conveyances, and claim different rights, are all properly joined as defendants in an action for the cancellation of the certificates.

The joinder of too many persons as defendants, where there is no misjoinder of subjects, is not a ground of demurrer by any one of them against whom the claimant states a good cause of action.

APPEAL from the Supreme Court. The complaint was filed in January, 1855. Three hundred and twenty-six persons are joined as defendants. One of them, William Cross, demurred to the complaint upon several grounds, which, so far as material, appear from the opinion which follows this statement.

The facts set forth in the complaint are as follows:

The plaintiff is a corporation, owning and operating a railroad extending from New Haven to New-York. The

capital authorized by the charter is limited to $3,000,000, represented by thirty thousand shares of stock, all of the shares except seventy-eight having been issued, and the capital paid in, less about $700 on the seventy-eight shares, several years since. Transfer books of the stock were kept at the city of New-York and two other places, where transfers of the stock were made and certificates issued as occasion required. From the organization of the company, in 1846, to the 3d of July, 1854, Robert Schuyler was the president and transfer agent of the company, having his station and place of business at the office of the company in New-York. As early as October, 1853, he commenced a series of fraudulent acts, extending over the whole period of time intermediate that date and the 3d of July, 1854, during which time, unknown to the plaintiff, he issued and disposed of a large number of certificates of stock of the company, which on their face purported to be genuine, were executed and signed in the same manner as genuine certificates, and undistinguishable from them, but which in fact were fraudulent over-issues for his own private purposes. Some of these he issued to a firm of which he was a member; the others were issued to divers other persons.

In other instances, after making transfers of stock for other parties on the books of the company, he failed to cancel the old certificates which were surrendered for that purpose, but fraudulently reïssued them as genuine certificates of stock owned by himself.

In furtherance of his designs he allowed clerks of his firm to give the firm and himself a false credit on the stock ledger of the railroad company, by which it was made ostensibly to appear that such firm and himself had stock to their credit on the books of the company to the amount of $1,000,000, when in truth it owned none.

These false certificates purporting to be genuine, and those originally genuine certificates which instead of being cancelled were reïssued, were used by Robert Schuyler in

his own, and in the business of his firm, under representations that they were genuine, chiefly for the purpose of borrowing money; were sold openly in the market as genuine stock in some instances, and have passed in this way into the hands of the defendants, the present holders.

In some instances, this over-issued stock has become commingled with genuine, by having, in the regular course of business, been transferred and incorporated into a certificate with the genuine.

The whole false issue amounts to near $2,000,000.

Nine thousand three hundred and eighty-three shares now stand on the books of the railroad company, in the names of twenty-nine persons and firms to whom it had been transferred by the firm to which Schuyler belonged. The balance of such over-issues has gone to the hands of two hundred and sixty-six other persons and firms at different times, in different amounts, from different persons; and many of these holders are also the holders of genuine stock.

Intermediate the 29th June and the 3d of July, 1854, Schuyler, the president and transfer agent of the company, being sick, Mr. Worthen, the vice-president, who was also one of the directors, undertook, but, as the plaintiff says, without authority, to act as transfer agent in the place of Schuyler, and, unaware of Schuyler's frauds, transferred four thousand four hundred and forty-six shares of that false stock for twenty-one different persons and firms, supposing the certificates he received and transferred to be genuine.

Some of the holders of this over-issue, as the complaint alleges, took, knowing the certificates were fictitious; some with reason to believe so; some on usurious contracts; many under circumstances which should have put them on inquiry, and many others under circumstances and upon considerations unknown to the plaintiffs.

They all claim rights against the company; some that they are stockholders; others that they are either stockholders or have a right of action against the company for

their losses. Some claim damages to the full nominal par value of the certificates they hold; others for the money they have actually advanced; while all assert a claim upon the company in some form. It is not averred that some of these fraudulently issued certificates have not gone into the hands of entirely innocent parties, for value.

Several of the defendants have sued the company. Some suits are pending in the Supreme Court; some in the Superior Court, and others in the Common Pleas of New-York city. Other suits are threatened. The complaint joins, in this suit, Robert Schuyler and all the alleged owners or holders of this over-issued stock, and prays that the certificates may be decreed illegal and void, and be surrendered up and canceled; that until these questions are all settled, those who have sued be stayed in their proceedings; that those who have not, be enjoined from suing; that the suits now pending be consolidated with this, and closes with the usual general prayer for such further or other relief as is meet and proper.

The defendant, Cross, had judgment at special term, allowing the demurrer and dismissing the complaint as to him. Upon appeal the Supreme Court, at general term in the first district, affirmed this judgment, and the plaintiff appealed to this court.

*William C. Noyes*, for the appellant.

*Francis B. Cutting*, for the respondent.

COMSTOCK, J. This case is somewhat special and extraordinary in its circumstances, and must be determined upon principles of reason and justice, with the aid of such analogies as the law will afford.

It is well settled that the directors or managers of a corporation are trustees for the holders of its stock. It is on this ground that the shareholders are entitled to relief in equity

against an actual or threatened waste or misapplication of its corporate funds.   It seems also to be settled that a suit for that purpose must be brought in the name of the corporation, unless it appears that the directors refuse to prosecute, or are themselves the guilty parties answerable for the wrong. If they do thus refuse, or are thus answerable, the shareholders may sue in their own names; but in such a case, the corporation must be made a defendant, either solely or jointly, with the directors sought to be charged. (*Robinson* v. *Smith*, 3 *Paige*, 222, *and cases there cited.*)   I have nowhere seen it laid down that the corporation itself, considered as a pure legal abstraction, is a trustee for its stockholders; yet it is not difficult to see that certain trust relations exist between it and them.   A corporation aggregate is clothed with a legal title to its real and personal estate, franchises and privileges, while the shareholders, as individuals, have in them equitable interests; the interest of each being in proportion to the amount of stock which he holds.   The corporation is entitled to receive, and does receive, the gross amount of the earnings; upon a trust, however, or at least under a duty, to pay over to the stockholders the net profits, as dividends upon their stock.   If not under all circumstances bound to make and pay over in money the dividends earned, it must, at all events, use them for the shareholders' benefit, in the prosecution of its legitimate enterprises, and subject to ultimate accountability.   If these relations are not precisely defined in the books, it is because the occasion has not arisen requiring this to be done.

The New-York and New Haven Railroad Company is a corporation aggregate, invested by its charter with certain privileges and powers, and with a legal title to all the real and personal estate acquired in the construction and operation of its road.   Its genuine and undoubted stock amounts to $3,000,000, and by its charter cannot exceed that amount. All this stock, with an exception of no importance to the question before us, has been paid for, and is held by share-

holders whose rights as such are not called in question. But, in addition to the $3,000,000 of undoubted stock, Mr. Schuyler, the president of the company, issued at different times, for his own private purposes, fraudulent and spurious certificates of stock, to the amount of nearly $2,000,000, which are now held by the numerous parties against whom this suit has been instituted. The president was the duly authorized agent to superintend the transfer of stock from any existing shareholder to another party, with authority in all cases to issue a new certificate, upon a transfer of the stock it represented being duly made in the books, and upon a surrender of the old one. The spurious certificates before mentioned were not based upon any transfer of genuine stock, nor did they represent stock in any sense whatever. In their appearance, however, they were genuine, and duly authorized. In form they were like those which represented the real stock of the company, and they were signed by a person who was known to have authority to sign under the conditions above named. Thus they obtained more or less currency throughout the community, being taken by various parties without attending to the forms and conditions prescribed by the charter and by-laws of the company, regulating the transfer of stock.

This extraordinary fraud could not fail to place the corporation in a situation of extreme difficulty and embarrassment. What was to be done with the spurious stock certificates? Were the holders to be recognized? Were they to share in the dividends, and were they entitled to vote at elections? Was the stock of the company practically increased to $5,000,000, when the charter confined it to $3,000,000? If this could not be done, then was the company bound to pay, in damages to each holder of these false instruments, the value which the genuine stock had borne in the market? These were grave questions, about which gentlemen of great eminence in their profession, and the courts also, differed. In the courts of original jurisdiction, it was

determined, after the institution of this suit, that the corporation was, in some form, bound to make good the false certificates. On appeal to this court, we held them void to all intents and purposes, and that the corporation and its genuine stockholders were entirely unaffected by them. (*Mechanics' Bank* v. *The New-York and New Haven Railroad Company*, 3 *Kern.*, 599.)

Such was the situation of this company on the discovery of these acts of Mr. Schuyler. As a pure creation of law, the corporation was not a sentient being; but the law, nevertheless, clothed it with authority which enabled it to act, by its board of directors, as a natural person, within the sphere of its powers and duties. It had therefore the rights which a natural person would have in analogous situations; and in order to evolve the principle of this controversy, we may suppose that a natural person is clothed with the legal title to, and is in possession of, an extensive line of railroad, receiving the gross earnings for the purpose of dividing the net profits amongst a large class of individuals, whose right, in certain fixed proportions, is evidenced by a certificate or declaration of trust, which each one holds, signed by the legal owner or his authorized agent. If, then, a new class of individuals should come forward claiming the same rights, and presenting, as the evidence thereof, instruments of the same kind in all respects, bearing on their face all the appearances of genuineness and authority, but in fact unauthorized and spurious, what would be the rights and the duty of the legal owner in that exigency? Upon the settled principles of equity, it would be his right and his duty to call the false claimants into court, in order to remove the cloud upon the equitable interests of those whom he represented. It would be his right, as owner of the legal estate, to bring to a determination every claim upon that estate, in law or equity, resting upon facts and documents giving to it, *prima facie*, all the appearances of genuineness and validity. It would be his duty to call for such a determination, as the

representative of numerous equitable interests carved out of his estate and placed under his protection.   These are principles so familiar and elementary that citations from the books are not required to support them.

With the aid of these analogies, we can come to a conclusion as to the rights of this corporation in the exigency which had arisen at the commencement of this suit.   It stood, as we have seen, in a *quasi* trust relation to its share-holders, holding, as it did, the legal estate, and they having, as individuals, an equitable right in the net earnings or income of the same estate.   They also had the right to vote at the elections of the company, to the exclusion of all other persons.   If the corporation yielded these rights to the holders of its original and genuine stock, and rejected the claims of those who held the false certificates, it became at once exposed, not merely to one, but to a multiplicity of suits, involving, as we have seen, questions of no inconsiderable difficulty.   In these circumstances, its right of resort to a court of equity, in order to have the spurious certificates canceled and annulled, does not admit of a doubt, provided those instruments were such, in character and appearance, as to bring them within the principles on which courts of equity administer protective and preventive justice.   There is no head of equity jurisdiction more firmly established than that which embraces the cancellation of instruments which are capable of a vexatious use after the means of defence at law may become impaired or lost, or when they are calculated to throw a cloud upon the title or interest of the party seeking relief.   But the jurisdiction does not universally attach on the mere ground that the deed or other contract is invalid.   If the invalidity plainly appears on the face of the writing, so that no lapse of time or change of circumstances can weaken the means of defence, it is held that no occasion arises for a suit in equity to decree its cancellation. And the doctrine now is, that such instruments do not, in a just sense, even cast a cloud upon the title or interest, or

diminish the security of the party against whom the attempt
may be made to use them. If, on the other hand, the inva-
lidity does not appear on their face, the jurisdiction is not
confined to instruments of any particular kind or class.
Whatever their character, if they are capable of being used
as a means of vexation and annoyance, if they throw a cloud
upon title or disturb the tranquil enjoyment of property,
then it is against conscience and equity that they should be
kept outstanding, and they ought to be canceled. These
principles of general jurisprudence are believed to be deci-
sive in favor of the right of this corporation to demand the
cancellation of the false stock and to maintain a suit in equity
for that purpose. On their face, as we have seen, the certi-
ficates of this stock are undistinguishable from those which
are genuine and true. They confer, therefore, upon each
holder a *prima facie* right as a stockholder. The evidence
of such right must in every case be repelled by showing
that the certificate does not represent the actual stock of
the company, and it is impossible to say that the means
of repelling these claims will always be as perfect as they
were when the frauds in which they originated were first
discovered.

It is true, we held in the case already mentioned, that the
company could successfully defend an action brought against
it for refusing to recognize one of these certificates; but the
defence rested, as it must if actions were to be brought upon
every other certificate, upon the extrinsic facts to be proved.
Conceding, even, that every one of these claims may be
defended, at whatever distance of time and under whatever
circumstances they may be pressed upon the corporation,
this by no means meets the equity of the case. If, as we
have held, no just claim against the corporation arises out
of these certificates, it is plainly unconscientious and inequi-
table that they should be kept on foot. Their very existence,
outstanding, is unjust, because it must of necessity exercise
a most depressing influence upon the real stock of the cor-

ALBANY, JUNE, 1858.                601

The New-York and New Haven R. R. Company *v.* Schuyler, Cross, &c.

poration.   We all know how sensitive are values in property of this description; and what conceivable facts could cast a deeper shadow over every genuine shareholder's interest than a spurious issue of $2,000,000 of stock, evidenced by certificates apparently valid, and under which every holder boldly and confidently asserted his claim?  The fact is not alleged in the complaint, but we can scarcely err in supposing that, on the discovery of these frauds, every share of valid stock must at once have lost nearly one-half of its market value.   That depression must continue, in a greater or less degree, while the certificates are allowed to stand. A decision against one of them, in an action founded upon it, is not a determination against any other one, and cannot, while the others are outstanding, restore to the genuine stock the value which justly belongs to it.   To say that the shareholders must remain in such a condition of insecurity and doubt, and must hold their shares under such a depression, would be to sanction a species of injustice which ought to be prevented.   These shares of stock are a description of property as much entitled to invoke the protective remedies peculiar to courts of equity as any other.

In applying these remedies to any other kind of property thus clouded and depressed by a written instrument professing to be, and on its face actually being, an incumbrance upon it, no doubt, it seems to me, would arise; and I think there is no well founded doubt in the present case.   And, besides these considerations, which affect the interests of the individuals whose legal identity in this controversy is lost in the corporate body representing them, we are to regard also the serious embarrassment which cannot fail to attend the internal administration of the affairs of the corporation itself. When this large addition of false stock became known, under which the holders confidently claimed to be shareholders, how could the corporation intelligently and safely proceed to regulate its elections and divide its earnings? These were difficulties which nothing short of a judicial

determination, against the spurious issue and canceling the false certificates, could effectually remove.

One of the views presented on the argument in support of the complaint was, that the corporation, as a trustee of the property and funds under its control, was entitled in that character to ask the advice and direction of a court of equity in regard to its obligations and duties in the circumstances which had occurred. Without having particularly examined this theory, I very much doubt whether it can be maintained. I have already spoken of the relations between the corporate body and its shareholders as having some analogy to those between trustees and *cestuis que trust;* but those relations are nevertheless *sui generis,* and they point to the corporation rather as the proper representative of its genuine stockholders, in a controversy of this kind, than as a trustee entitled for its own sake to ask the advice of the court as to the mode of discharging its functions. When a trustee invokes the interference of equity on such a ground, he does it for his own protection; and the interests of the beneficiary are not of themselves an element of the jurisdiction. But it is difficult to separate, even in abstract contemplation, the rights and interests of a corporation from those of the shareholders. If the corporation exceeds its powers, or misappropriates its funds, the stockholder may complain, or if the evil be only threatened, he may arrest it by injunction; but if the controversy is with third parties, the interests of the corporate body and of the individuals who compose it are so nearly identical that a separation in theory or practice would seem to be impossible.

For this reason there is a great difficulty in sustaining the present suit as one brought by a trustee to be advised and directed in regard to the proper line of duty towards the *cestuis que trust* and those who claim to stand in that relation. But the same reason unerringly indicates the corporation as the organ through which the shareholders are to be heard when legal wrongs are to be redressed or equitable reme-

dies are to be invoked. If, therefore, I have been successful in showing that the fraudulent certificates of stock are instruments of such annoyance and vexation, in depressing values and disturbing the fair enjoyment of rights, that they ought not to be allowed to stand, then this suit by the corporation rests firmly upon that branch of equity jurisdiction which includes the cancellation of such instruments.

The views which have been taken assume the invalidity of all the certificates fraudulently issued by Schuyler. Upon the facts stated in the complaint, which the demurrer admits to be true, and upon the principles laid down in the case of the Mechanics' Bank against this company (*supra*), it is impossible to say that any one of· them is a valid representative of stock, or a claim of any kind against the corporation. It appears, indeed, that most of the certificates have passed into the hands of third parties; and the decision of the court below assumes that those parties, in good faith, paid for or advanced value upon the shares. On that ground it was further assumed that their rights were superior to those of the corporation and the holders of its actual and genuine stock. This is a view of the question which holds a prominent place among the reasons given for dismissing the complaint. But since the court below pronounced its judgment, the other case mentioned came before us on appeal, and the contrary doctrine was very precisely determined, and upon the fullest consideration. Adhering as we do to that decision, and looking at the case as the complaint states it, all the certificates in question must share the same fate; and the present case will not be embarrassed by the necessity of rendering different judgments in respect to different parties. In saying this much, however, it is not designed to prejudge the rights of any person in special circumstances, to be defensively alleged and proved, differing in their character from any yet called to our attention.

The only remaining question is one of multifariousness in respect to parties or causes of action. The mere joinder of

too many persons as defendants, when there is no misjoinder of subjects, is not a ground of demurrer by any one of them against whom the complaint sets forth a good cause of suit. A demurrer may be interposed for a defect of parties, but not for the reason merely that too many are brought in. (*Code of* 1852, § 144.) In respect to the joinder of causes of action, the provision of law, so far as material to the question, now is, that "the plaintiff may unite in the same complaint several causes of action, whether they be such as have heretofore been denominated legal or equitable, or both, where they all arise out of the same transaction or transactions connected with the same subject of the action." (*Code of* 1855, § 167.) The authors of the Code, in framing this and most of its other provisions, appear to have had some remote knowledge of what the previous law had been. This provision, as it now stands, was introduced in the amendment of 1852, because the successive Codes of 1848, 1849 and 1851, with characteristic perspicacity, had in effect abrogated equity jurisdiction in many important cases, by failing to provide for a union of subjects and parties in one suit indispensible to its exercise. This amendment, therefore, was not designed to introduce any novelty in pleading or practice. Its language is, I think, well chosen for the purpose intended, because it is so obscure and so general as to justify the interpretations which shall be found most convenient and best calculated to promote the ends of justice. It is certainly impossible to extract from a provision so loose and yet so comprehensive any rules less liberal than those which have long prevailed in courts of equity.

It is only necessary, therefore, to determine whether, in a suit instituted for the purpose of canceling the invalid certificates of stock in the plaintiffs' corporation, all the claims under these instruments can be united, and all the parties holding them brought in, without rendering the suit obnoxious to the charge of multifariousness, as that term has hitherto been understood. The convenience of settling the

The New-York and New Haven R. R. Company *v.* Schuyler, Cross, &c.

whole controversy in a single suit is obvious; because the only alternative is, that the corporation would be entitled to institute, and must institute, a separate action against each of the numerous parties claiming under these certificates. No one of the parties would be bound by a decision against any other one; and intolerable expense and delay might be the consequence of such a course.

The rule on this subject has been often considered, both in England and this country, and has become tolerably well settled, although in regard to some of its applications there is a diversity in the adjudged cases. In the case of the *Mayor of York* v. *Pilkington* (1 *Atkyns*, 283), decided by Lord HARD-WICKE in 1737, the corporation of York claimed an exclusive right of fishery in the River Ouse for a large tract; and the bill was filed against various persons claiming several and distinct rights in the same fishery, in order to quiet the plaintiffs' title and also for a discovery and account of the fish the defendant had taken. A demurrer to the bill for multifariousness was overruled after being twice argued, the lord chancellor observing: "It was no objection that the defendants have separate defences; but the question," he added, "was whether the plaintiffs have a general right to the sole fishery, which extends to all the defendants." Nearly a century later, Lord ELDON referred to this case as standing on the ground that "where the plaintiffs stated themselves to have an exclusive right, it signified nothing what particular rights might be set up against them, because if they prevailed the rights of no other person could stand." And he added: "It has long been settled that if any person has a common right against a great many of the king's subjects, inasmuch as he cannot contend against all of the king's subjects, a court of equity will permit him to file a bill against some of them, taking care to bring in so many persons before the court that their interests shall be such as to lead to a fair and honest support of the public interests." (*Jac. & Walk.*, 369.) In *Whaley* v. *Dawson* (2 *Schoales &*

*Lefroy,* 370), Lord REDESDALE considered the test to be whether there was a "general right in the plaintiff covering the whole case, although the rights of the defendants may have been distinct." In referring to the *Mayor of York* v. *Pilkington,* and analogous cases, he observed: "The court has gone upon the ground of preventing multiplicity of suits, one general right being claimed by the plaintiffs against all the defendants." The same eminent authority, in the treatise on Equity Pleading (*Mitford Eq. Pl.,* by *Jeremy,* 181), says: "The court will not permit a plaintiff to demand by one bill several matters of *different natures* against several defendants; but when one general right is claimed by the bill, though the defendants have separate and distinct rights, a demurrer will not hold."

The subject of multifariousness is very elaborately and carefully examined by Mr. Justice STORY, in his treatise on Equity Pleading. Adopting the views and in part the language of Lord COTTENHAM, in *Campbell* v. *Mackay* (1 *Mylne & Craig,* 623, 624), he lays down the following doctrine: "The result of the principles to be extracted from the cases on this subject seems to be, that where there is a common liability and a common interest, a common liability in the defendants and a common interest in the plaintiffs, different claims to property, at least if the subjects are such as may without inconvenience be joined, may be united in one and the same suit." (§ 533.) He adds: "Indeed, where the interests of the plaintiffs are the same, although the defendants may not have a coextensive common interest, but their interests may be derived under different instruments, if the general objects of the bill will be promoted by their being united in a single suit, the court will not hesitate to sustain the bill against all of them." In this State, the joinder in one suit of causes of action in some sense distinct from each other, with all the necessary parties for their determination, has always been allowed with great liberality where the convenience and the ends of justice have required it. In

· ALBANY, JUNE, 1858. 607

The New-York and New Haven R. R. Company *v.* Schuyler, Cross, &c.

*Brinckerhoff et al.* v. *Brown et al.* (6 *John. Ch.*, 139), it was held that different judgment creditors might unite in one bill for the purpose of reaching the estate of their common debtor, which he had fraudulently conveyed, and that the bill might be filed against persons relative to matters of the same nature, forming a connected series of acts, all intended to defraud and injure the plaintiffs, and in which all the defendants were more or less concerned, though not jointly in each act. In the case of *Fellows et al.* v. *Fellows et al.* (4 *Cow.*, 682), the bill charged that the several defendants, in combination with each other and with the debtor of the plaintiffs, took from him separate conveyances of his property, without consideration and in order to defraud the plaintiffs. One of the defendants answered, denying the combination, and demurred to the residue of the bill, because it included distinct matters in many of which he was not concerned. The demurrer was overruled, the chancellor observing: "If instead of one matter in demand, here are three (the three conveyances in question); they are all of the same nature in respect to the questions they now present. Each of the three defendants holds a portion of the property of John Fellows (the debtor) by a fraud, and by a fraud of the same kind. The right of the complainants is against the whole property, and their right against all portions of it is of one nature. The claims of the three defendants, now holding the property in question, are of one character, each of them holding under a fraudulent transfer." "This, therefore, is not a case of several matters of distinct natures in the sense of the rule upon that subject." The decision was appealed from to the Court for the Correction of Errors, and was there unanimously affirmed, after a very full discussion by counsel and elaborate consideration in the opinions of several members of the court.

Many other cases might be mentioned, exhibiting varieties in the application of the general rule declared in those which have been cited. But it is unnecessary to refer to

them. The rule itself is settled too firmly to be shaken, and it would seem to be decisive of the present question. In this case there is a single interest in the plaintiffs directly opposed to the interests of all the defendants. The common point and centre of the litigation is the stock, property and franchises of the plaintiff's corporation, in which the defendants claim specific shares and proportions as holders of the false certificates. The rights claimed by the defendants are distinct, because they rest upon separate instruments as the evidence thereof; but they are of precisely the same nature, they turn upon the same question, and they are a cloud upon the same estate. Each certificate is a false muniment of the holder's title to a particular interest in the corporate estate, vested as a unit in the corporation but equitably belonging to the holder of its actual stock.

Among the grounds of the argument, in behalf of the plaintiffs, it was insisted that the suit is maintainable on the principles of a bill of peace, or suit to quiet a title and prevent a multiplicity of actions. A suit in equity to establish a sole right of fishery against several hostile claimants, or by a parish priest to establish a right to tithes against the parishioners or by the parishioners to establish a modus, are examples of a bill of this kind. It will be found, however, that there is nothing in the rules which govern the technical bill of peace to justify a misjoinder of subjects or parties in the litigation. But the number of parties and the multiplicity of actual or threatened suits will sometimes justify a resort to a court of equity when the subject is not at all of an equitable character, and there is no other element of equity jurisdiction. Even in such cases there must be such a unity of interest on one side or the other as to bring the litigation within the ordinary rules of equity pleading. This suit, I think, could be sustained as a bill of peace, but the question of misjoinder would be the same. Without referring to the principles of such a bill, we sustain the jurisdiction on the ground that the controversy is of an equitable nature,

for the reasons which have been given at large; and we hold that the objection for multifariousness merely is untenable within ordinary and established rules on that subject. If all the invalid certificates were now held by one person, the jurisdiction would attach in order to have them canceled, and the suit would be against him alone. Being held by various parties, the jurisdiction still depends on the same principles; but all the parties can be united, because there is such a unity in the controversy with all of them as to render it fit and proper, according to settled principles, that they should be joined in a single suit.

The judgment of the Supreme Court must be reversed, and judgment entered overruling the demurrer, with the usual leave to answer.

SELDEN and ROOSEVELT, Js., did not sit in the case; all the other judges concurring,

Judgment reversed, and demurrer overruled with leave to