Board of Supervisors of Saratoga County agt. Deyoe.

---

## COURT OF APPEALS.

THE BOARD OF SUPERVISORS OF SARATOGA COUNTY, appellant, agt. ELLA DEYOE, impleaded, &c., respondent.

*Interpleader — what facts necessary to sustain — Bill quia timet — Bill to prevent a multiplicity of suits.*

Where a large number of claims are made against a party growing out of transactions of the same nature, a part of which are valid, and a part void, an action in the nature of a bill of peace will lie against all parties to prevent a multiplicity of suits.

So, held, where a county treasurer was authorized to borrow $20,800, upon notes for the benefit of the county, and he issued $138,000, referring to the same resolution for authority.

Although the questions are new and the case is anomalous, the court will sustain an action in equity when the principles of equity require it should be done to avoid great expense and a multiplicity of suits.

Such an action is proper when matters are so entangled that the party is liable to a double recovery against him for the valid debt (*Reversing S. C.*, 15 *Hun*, 526).

*May*, 1878.

This is an appeal from a judgment of the general term, third department, affirming a judgment dismissing the complaint. This action is commenced on the equity side of the court for the purpose of bringing to a speedy determination, by one suit, a litigation, which will otherwise last many years, with great expense. It is conceded that thirty-one of the defendants have commenced separate actions against the board of supervisors. It is also conceded that the other twenty-four defendants intend to bring actions upon the same class of notes. It is conceded that $138,631 in notes have been issued by the county treasurer, of which amount only $20,800 are valid. Notwithstanding equity and economy would seem to concur that it would be wise to end the litigation by one suit, where it is conceded justice can be done to all parties with the least expense, the special term sustained a demurrer to the complaint, and held that such an action cannot be maintained. Judgment was entered on that decision, and that judgment was affirmed at the general term.

*E. F. Bullard*, for plaintiff, appellant.

I. This action can be maintained upon well settled principles laid down in equity cases, as a bill in the nature of a bill of interpleader (*Schuyler* agt. *Pelissier*, 3 *Ed. Ch.*, 191, 192). In *Shaw* agt. *Coster* (8 *Paige*, 339, *at page* 345), chancellor WALWORTH says: "The complaint must also show that he is in the situation of a mere stakeholder having no personal interest in the controversy between the defendants, and that their respective claims against him are of the same nature or character" (2 *Story's Eq.*, sec. 812 ; *Story's Eq. Pl.*, secs. 294, 297). The defendant's claims in the case at bar are of

the same nature and character as stated by the chancellor in the case of *Shaw* agt. *Coster* (*supra*). There is but one fund of $20,800, which the county is ready to divide between the rightful owners. There is but one debt of $20,800, which the county is ready to pay to the proper parties as soon as they can be ascertained. The cases cited by the defendant's counsel do not sustain the defense.

II. This suit can properly be sustained as a bill *quia timet.* The following quotations from the able opinion of judge Comstock, in the court of appeals, in the case of *The N. Y. and N. H. R. R. Co.* agt. *Schuyler and others* (17 *N. Y.*, 592), fully sustains the propriety of the action at bar: At page 599 the court says: " If the corporation rejected the claims of those who held the false certificates, it became at once exposed not merely to one, but to a multiplicity of suits, involving as we have seen, questions of no inconsiderable difficulty. In these circumstances its right of resort to a court of equity in order to have the spurious certificates canceled and annulled, does not admit of a doubt." " There is no head of equity jurisdiction more firmly established than that which embraces the cancellation of instruments, which are capable of a vexatious use, after the means of defense at law may become impaired or lost" (*Page* 600). When that case was last before the court of appeals (34 *N. Y.*, 31), the principles above laid down are not overruled, but are approved by Davis, J., at page 45, where he says: " The number of parties, etc., and the multiplicity of suits will sometimes justify a resort to a court of equity, when the subject is not at all of an equitable character. As early as 1723, lord Macclesfield, as chancellor, decreed that a policy of insurance be canceled which was obtained by fraud, although there was a complete defense at law (*De Costa* agt. *Scandret*, 2 *Piere Williams*, 170). These cases are all cited and approved by the court of appeals in the late case of *McHenry* agt. *Hazard* (45 *N. Y.*, 580). That was a bill to order a written contract given to one Thompson, to be canceled, upon which two actions had been

commenced by different assignees of Thompson. ANDREWS, J., says : " The power of a court of equity to compel the surrender of deeds, &c., obtained by fraud, or held for inequitable or unconscientious purposes, is undoubted." *Bailey* agt. *Briggs* (56 *N. Y.*, 407), cited by the defendants and relied on by the courts below, was an action to construe a single clause in a will, and was not brought by the executor. At page 416, the court, FOLGER, J., says : " Nor is it a bill of peace ; there is not a great number of person interested in the questions in dispute. Nor is the action necessary to prevent a multiplicity of actions." The rights of the parties rest entirely in the construction which the law will place upon a paragraph in a written instrument, and the true meaning of which can readily be pronounced by a court of law. The court below cites *The Town of Venice* agt. *Woodruff*, *&c.* (62 *N. Y.*, 462). That case is unlike the case at bar. In that case none of the bonds in question were valid. They were all void, and the plaintiff had a perfect defense at law at all times, and the claimant could not recover upon presenting and proving the bonds. They must go further, and show affirmative authority, which, it was conceded, did not exist, whereas, in the case at bar part of the notes are valid and part are invalid, and it is a mixed and complicated question of fact to select the good from the bad, which can only be done by hearing the special facts applying to each and every case. It will require a trial in the nature of taking an account of the dealings in each case. In *Marsh* agt. *City of Brooklyn* (59 *N. Y.*, 280), the court, FOLGER, J., says : " Equity may be invoked when the claim or lien appears to be valid on its face, and when the defect can only be made to appear by extrinsic evidence, which will not necessarily appear in proceedings by the claimant to enforce the lien." The case at bar comes within this rule. The claimants would prove the resolution authorizing the treasurer to borrow the $8,000 and prove the note, which would make a *prima facie* case. To defeat such action the board of supervisors must prove by other claimants that they had, prior

to that date, loaned the full $8,000 to the treasurer, and thus have exhausted his power. An account must thus be taken of the moneys advanced. The plaintiff might then reply that it did not appear but that his money was used to pay a part of the $12,800 which the treasurer was authorized to renew or extend. This would compel the board to swear each of the fifty-five defendants to prove which money was used for that purpose. The court will see at once that questions would arise upon complicated accounts that a jury could not well determine unless they were allowed to employ bookkeepers, and take the books, vouchers and evidence to go through the account. In *Sickles* agt. *Richardson, &c.* (6 *Weekly Dig.*, 273), the action was sustained by stockholders to have railroad bonds declared invalid. *Guest* agt. *The City of Brooklyn* (69 *N. Y.*, 506), reported since the decision of the court below, does not question the Schuyler case or the Hazard case, before cited, and CHURCH, Ch. J., at page 514, quotes and approves the case of *Marsh* agt. *The City of Brooklyn*, above cited. After stating, as a general rule, that courts will not interfere to set aside a void assessment or tax title, at page 513, he adds: "There are recognized exceptions to this rule, but they are restricted within defined and established rules. These exceptions are: 1. To prevent a multiplicity of actions. 2. To remove a cloud from the title." The judge says: "It does not appear that any other action will be prevented." In that respect it was different from the case at bar. The latter does come within the exception. *Townsend* agt. *The City of Brooklyn* (*reported* 7 *Weekly Dig.*, 9) contained the averments necessary to give the court jurisdiction in equity, by averring that evidence *aliunde* would be necessary to show the irregularities.

III. This action is eminently proper as a bill of peace to prevent a multiplicity of suits. "Courts of equity can bring before them all parties interested in the subject-matter, and adjust the rights of all, however numerous" (1 *Story's Eq. Jurisprudence, sec.* 25). Lord REDESDALE says: "The juris-

diction of a court of equity is to be exercised in ten cases (8), to put a bound to vexatious and oppressive litigation, and to prevent multiplicity of suits" (1 *Story's Eq. Jurisprudence*, sec. 32). *The New York and N. H. R. R. Co.* agt. *Schuyler and others* (17 *N. Y.*, 592), fully sustains the propriety of the action at bar. "Whenever those facts did justify such resort, a court of equity would fully dispose of all the rights and questions springing out of the subject-matter of the suit as to every party, however multitudinous or complicated they might be." The case at bar contains all the special circumstances which sustained the bill in that case. "The general doctrine of public policy, which, in some form or other, may be found in the jurisprudence of every civilized country, is, that an end ought to be put to litigation, and above all, to fruitless litigation" (*Willard's Eq. Jur.*, 323 [*Potter's ed.*]). "The obvious ground of the jurisdiction of courts of equity in cases of this sort (bill of peace), is to suppress useless litigation, and to prevent multiplicity of suits" (*Willard's Eq. Jur.*, 323 [*Potter's ed.*]). "To entitle a party to maintain a bill of peace, it must be clear that there is a right claimed which affects several persons, and that a suitable number of parties in interest are brought before the court" (*Cowper* agt. *Clerk*, 3 *P. Williams*, 157; *Alexander* agt. *Pendleton*, 8 *Cranch*, 468). The case of *The Mayor of York* agt. *Pilkingston* (1 *Atkins*, 282), decided by lord HARDWICK in 1737, was an action to quiet the plaintiffs in a right of fishery in the River Ouse, of which they claimed the sole fishery for a large tract, against five lords who claimed several rights, &c. This case was cited and approved by the same chancellor, in *Lord Tenham* agt. *Herbert* (2 *Atkins*, 483). In that case there were but two defendants, but the court say, in regard to the former case, "and as this large jurisdiction (fishery) entangled the complainants with different lords of manors, it would have been endless for the corporation to have brought actions at law." In *Hanson* agt. *Gardner* (7 *Vesey Ch.*, 310), lord ELDON, chancellor in 1802, says of these two cases: "The

principle as to the multiplicity of suits is very clearly stated in those cases, that there would be no end of bringing actions of trespass." This last case cited and approved (2 *Story Eq.*, sec. 854). A bill of peace "may be resorted to where one defends a right against many, or where many claim a right against one. In such cases courts of equity interpose in order to prevent multiplicity of suits;" citing *Ware* agt. *Horwood* (14 *Vesey*, 28), decided in 1807. The question was: "1st. Whether this court can give relief upon instruments declared void at law, under the annuity act." *Hodges* agt. *Griggs* (21 *Vt.*, 280) lays down this rule in sustaining a bill of peace by the holder of a note given for a part of the purchase-money of a farm which was to become void in case an attachment levied upon the land should be held a valid lien. The principles above laid down, and most of the cases cited, were approved by the commission of appeals in the case of *The Third Avenue Railroad Co.* agt. *Mayor, &c., of New York* (54 *N. Y.*, 159). In that action in equity, seventy-six suits were restrained by injunction and one allowed to proceed, to avoid a multiplicity of suits. The court could, with propriety, have went further and enjoined all of the suits and determined the legal question in that action. The Constitution of 1847 and the Code of 1848, in the most emphatic manner, condemned and abrogated the old rules and practice which would turn a party out of court because he was in the wrong forum, or had given a wrong definition to the remedy he was entitled to. 1st. The bill of discovery is entirely superseded by the right to examine the party before trial in any action, legal or equitable. 2d. If a party has brought an equitable action, his rights can be fully determined in that action without first sending him back to a court of law to test his title, as held in *West* agt. *Mayor* (10 *Paige*, 540). The general term concedes that it would be a convenience, but did not discover it could be done, as settled by this court, in *Corning* agt. *Troy Iron and Nail Factory* (40 *N. Y.*, 191). In that case it was held that, since the Code, it was not neces-

sary for a party to bring an action at law to establish his right before he could resort to equity for relief. As the same court has full jurisdiction in both cases, a complete remedy can be given in one action.

IV. This action should be sustained upon broad principles of equity, even if no precedent could be found. "Equity may be defined natural right or justice, as addressed to the conscience, independent of express or positive law; a system of jurisprudence the object of which is to render the administration of justice more complete, either by the application of rules to cases not provided for by positive law * * * or by adopting remedies more exactly to the exigencies of particular cases" (*Burrill Law Dict.*, *tit. Equity*; 3 *Blackstone Com.*, 429). "Every system of laws must necessarily be defective, and cases must occur to which the antecedent rules cannot be applied without injustice, or to which they cannot be applied at all" (1 *Story's Eq. Jur.*, sec. 7). "The matters of which equity holdeth cognizance in its absolute power are such as are not remediable at law, and of them the sorts may be said to be as infinite almost as the different affairs conversant in human life" (1 *Story's Eq. Jur.*, sec. 8). Barlow says: "And thus, in chancery, every particular case stands upon its own circumstances, and although the common law will not decree against the general rule of law, yet chancery doth, *so as the example, introduce not a general mischief*" (1 *Story's Eq. Jur.*, sec. 10). The courts are yearly making new precedents to meet the demands of an advancing civilization. If no fraud in all respects like this has been heretofore committed, of course there would be no precedent to follow. It is conceded that the plaintiff is uncertain who are the rightful owners of said debt, or how much of the same is due to either defendant, and with due diligence has not been able to ascertain the same. To look at the case as a practical question, as it will arise on the trial of the common law actions, if they shall be allowed to proceed: First. The single plaintiff will present the resolution and prove his note,

and then the *onus* will be thrown upon the county to prove, by extrinsic evidence, that the full power to issue had been exhausted before the issue of the note on trial. If that note was not issued until August, the proving of the issuing of the $50,000, dated February fifteen, would not show the power exhausted, because it would not appear that the county had obtained a single dollar on these notes. If the holders of those notes are called, it may turn out that they were mere renewals of void notes, held by the same parties. If the plaintiff in the first suit succeeds and recovers a verdict on the ground that his was a part of the $20,800 valid debt, the tenth plaintiff will not be *estopped* by that verdict, but he may come in and show that the parties were mistaken, and that his note was one of the valid ones, and a part of the $20,800.

V. The notes issued by Mann in excess of the $20,800 authorized, are not valid against the county. It is conceded that this court must determine that question upon the facts stated in the complaint (*Lange* agt. *Benedict*, 18 *Albany Law Journal*, 12).

VI. Even courts of equity have at times assumed to limit their jurisdiction by fixed rules and special definitions. Hence we have bills of interpleader, discovery, of peace, *quia timet* and account. But the experience of mankind has, from time to time, compelled the courts to enlarge their precedents in order to prevent a failure of justice. Hence, actions were sustained in the *nature of* a bill of interpleader. The action at bar contains some characteristics which bring it within each of the above definitions. Bills were finally sustained to prevent a confusion of boundaries (2 *Story's Eq.*, sec. 860). No harm can arise from the trial and determination of this action. If a judge desires to decide wrong he can always find an *excuse ;* if he desires to do right he can always find *power*. If the defendants are compelled to answer, and upon hearing the whole evidence, the court should hold that the county is liable for all of the notes, judgment would pass against this

plaintiff, and the litigation would end. If the court shall hold that the county is only liable for the $20,800, then the defendants among themselves could have it decided which were the rightful owners of the fund. In either aspect of the case, all parties would be saved great expense, a long litigation would be avoided, and the example "*would not introduce a general mischief.*"

*Neary & Martin*, for defendants, respondents.

ANDREWS, *J.*— This is an appeal from the judgment of the general term affirming the judgment of the special term, sustaining the demurrer of the defendant, Ella Deyoe, to the plaintiff's complaint.

The complaint shows that each one of the fifty-three defendants is the holder of one or more notes, purporting to be the notes of the county of Saratoga, issued by Henry A. Mann, county treasurer, in 1875, and signed by him in his official character, and which amount in the aggregate, to $138,631.

The notes on their face refer to a resolution of the board of supervisors passed in November, 1874, as the authority under which they were issued. The board of supervisors in that month, by resolution, directed the county treasurer to procure an extension of a county debt of $12,800.44, maturing on or before February 12, 1875, and by another resolution authorized the treasurer to borrow on the credit of the county the sum of $8,000, payable in one year with interest.

The resolution last referred to was the only authority given by the supervisors to the treasurer to borrow any money on the credit of the county. The treasurer, pretending to act under the authority of this resolution, on the 15th day of February, 1875, issued notes dated on that day to an amount exceeding $50,000, and from time to time during that year issued other notes, making seventy-three in all of the aggregate amount before stated.

From the avails of these notes the treasurer paid the debt of $12,800.44.

The complaint charges and the defendant, by her demurrer, admits that the notes are not valid or legal debts against the county, except to the extent of $20,800.44, and to this extent the complaint concedes that the county is liable thereon. Prior to the commencement of this action thirty-one of the defendants had brought separate suits against the county, to recover on the notes held by them respectively, and the complaint charges that the other defendants in like manner intend to commence suits on their claims.

In addition to the facts above stated the complaint alleges that the plaintiff is uncertain and with due diligence has been unable to ascertain who are the rightful owners of the debts, owing by the county, or how much of the same is due to either of the defendants, and that it cannot with safety determine the question; that the county is ready and willing to pay the $20,800.44, as soon as it can be ascertained who are rightfully entitled thereto, and that a litigation with each defendant in a separate suit, upon his claim, will subject the plaintiff to great and unnecessary expense and trouble and will be oppressive and vexatious.

The relief demanded is that the defendants and each of them may be enjoined and restrained from further prosecuting the actions commenced against the plaintiff, or from commencing other actions upon the claims mentioned, and that it may be adjudged which of the notes held by the defendants are valid debts against the county and which are invalid, and that the invalid notes be surrendered and canceled. The plaintiff also asks that the defendants may interplead and for general relief.

The question presented is whether upon the facts stated in the complaint a case is made which, upon principles of equity, entitle the plaintiff to implead the fifty-three holders of the notes for the purpose of having their respective rights and the liability of the county determined and settled in a sin-

gle action. It is plain that the authority of the treasurer to issue the obligations of the county was limited to issuing notes to the amount specified in the resolution of the supervisors. The issue of notes beyond that amount was a palpable breach of duty and a transgression of the limits of the authority conferred.

The question whether, notwithstanding the limitation of the authority, persons dealing with the treasurer and advancing money in good faith upon his assurance that the particular transaction was a part of the authorized dealing, does not, we think, arise upon the case as now presented. The demurrer admits that the actual authority was that conferred by the resolution of the supervisors, and that the county is not liable beyond the sum alleged in the complaint.

The defendants may, by answer, set up the facts upon which they rely to establish the liability of the county for their respective demands, although the power of the treasurer under the resolution had been in fact exhausted when the particular dealing took place.

We shall assume, in disposing of the case before us, that the county is only liable to the extent of $8,000 and the additional sum received on the notes which was applied to the use of the county, and leave the determination of the question whether it is liable beyond these amounts, to be determined when the facts shall be fully presented.

The case then is briefly this: The county owes a debt of $20,800.44, which it is ready and willing to pay. This debt is represented by notes of the county treasurer which are admitted to be valid. The treasurer, under an authority to issue notes for money advanced to the county to the amount of this debt, had fraudulently issued notes amounting in the aggregate to many times this debt. These notes, seventy-three in number and of various amounts, are held by fifty-three different individuals who are the defendants in this action.

The county is not liable upon the notes beyond the sum

above stated. The valid and invalid notes are of the same form and all refer on their face to the same resolution of the supervisors as the authority under which they were issued.

The subject has become so complicated and entangled by the acts of the treasurer that the county cannot distinguish the valid from the invalid notes. Thirty-one of the fifty-three defendants have commenced separate suits upon the notes held by them, and the other defendants are about to commence similar actions.

It is to be observed that the claims of the several defendants are of the same general nature; that is to say, they all arise upon notes issued by the county treasurer and which purport to have been issued under the same specific authority. Each defendant claims, by virtue of a contract with the county, through the treasurer. Each defendant also claims that the notes held by him are valid obligations of the county. But upon the averment in the complaint, admitted by the demurrer, that the whole liability of the county does not exceed $20,800.44, this claim, in substance, is equivalent to a claim by each defendant — that the note held by him represents a part of that sum. It is very obvious that upon the fact stated in the complaint the prosecution of separate actions by each defendant will involve the county in great perplexity and embarrassment. It cannot voluntarily pay the claims of any of the defendants because it cannot distinguish between them. It will be compelled to litigate the several actions and in such separate litigations it will encounter the further difficulty that a judgment in one action will not determine the rights of the claimant in any other action.

If judgments against the county to the extent of the conceded debt shall be obtained, it will not prevent a recovery by the other claimants in a subsequent trial and before another jury, where the facts may be changed or more fully disclosed, or different inferences be deduced from them. In the separate litigations, all the claimants will be indifferent as to the result of the litigation in any of the cases except their own.

So that it is not an unfounded apprehension that if the suits are separately prosecuted the county may be compelled to pay the whole sum represented by the notes, although, as matter of law, its liability to the several claimants, in the aggregate, does not exceed the sum of $20,800.44.

It does not require any argument to show that convenience and the ends of justice will be subserved by an investigation and determination of the whole controversy in a single action, wherein the extent of the county's liability, and the persons in favor of whom such liability exists, may be settled and adjudged. In such an action it will be to the interest of each claimant to present the facts in support of his own claim and to resist the claims of others. The material facts will, in this way, be brought to light and a decision reached upon a view of all the material circumstances. I am of opinion that facts, stated in the complaint, disclose a case for equitable interference to restrain the prosecution of separate actions and to have the rights of the parties determined in a single suit.

It may be true, as claimed, that there is no exact precedent to be found in the books, but the case is itself anomalous. An elective officer charged with public duties has violated his trust and has issued obligations purporting to be the obligations of the county, which for the most part (as we now assume) are invalid and do not bind the county. The taxpayers are the persons ultimately bound to respond and to pay the obligations to the extent they are found to be valid. The county is ready and willing to pay what it owes as soon as its creditors can be ascertained. It cannot safely pay without litigation. It stands in the position of holding a fund equal to its admitted debt which is claimed by many persons, and it asks by this action that the court will interfere to prevent multiplicity of suits and to determine the rights of all the claimants in a single action, the general question in which will be the same as to each defendant, viz.: Whether the particular claim represents any part of the admitted debt.

The prevention of a multiplicity of suits as said by chan-

cellor KENT, in *Brinkerhoof* agt. *Brown* (6 *Jo. Chy.*, 151), is a very favorable object with a court of equity, and the number of parties, and the multiplicity of actual or threatened suits will, as stated by COMSTOCK, J., in the case of *The New York and New Haven Railroad Company* agt. *Schuyler* (17 *N. Y.*, 608), sometimes justify a resort to a court of equity when the subject is not at all of an equitable character, and there is no other element of equity jurisdiction. It is upon this ground that bills of peace are entertained, viz., to quiet unnecessary litigation (*Story Eq. Jur.*, sec. 854; *Mitford Eq. Pl.*, 145). The maintenance of this action will subserve this purpose. It will also protect the plaintiff against the hazard of a double recovery, which is the ground upon which bills of interpleader are sustained (*Baudeau* agt. *Rogers*, 2 *Paige*, 209; *Bedell* agt. *Hoffman*, *id.*, 199; 2 *Daniels' Chy.*, 1562).

The case presents the elements which justify the interposition of a court of equity. It may not be a case of interpleader strictly, or which meets all the definitions of a bill of peace, nor a case which could be maintained solely as one for the cancellation of written instruments, but it combines, to a greater or less extent, elements of jurisdiction in each of these cases, and the action, we think, may be sustained without a violation of principle and without interfering with the substantial rights of the defendants.

The judgment of the general term should be reversed, and the demurrer overruled, with liberty to the defendant to answer on payment of costs.

All concur except DANFORTH, J., dissenting, and MILLER, J., not voting.