EMERSON and another, Respondents, vs. NASH and others, Appellants.

*February 1—March 14, 1905.*

(1–13) *Pleading: Liberal construction: Demurrer: Indefiniteness: Joinder of causes: "Same transaction:" "Same subject of action:" Primary rights.* (14) *Contract to obtain options on land: Performance: Waiver.*

1. "In the construction of a pleading for the purpose of determining its effect its allegations shall be liberally construed, with a view to substantial justice between the parties." Sec. 2668, Stats. 1898.

2. "The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party." Sec. 2829, Stats. 1898.

3. Applying the foregoing to a pleading on demurrer thereto every reasonable intendment and presumption is to be made in favor thereof for the purpose of supporting it. All unfavorable constructions are to be deemed subordinate to those which are reasonably otherwise, and all essentials are to be regarded as sufficiently stated which can by reasonable construction and inference be discovered in the language used.

4. A pleading is never to be condemned on demurrer for mere indefiniteness or uncertainty. The proper remedy therefor is a motion to make it more definite and certain.

5. The terms of sec. 2647, Stats. 1898, "The plaintiff may unite in the same complaint several causes of action, whether they be such as were formerly denominated legal or equitable, or both, where they arise out of the same transaction or transactions connected with the same subject of action," should be liberally construed according to the rule as to remedial laws.

6. To constitute a cause of action there must be a right possessed by one or more persons and a violation thereof by another or others. The basic element is commonly called a "primary right."

7. The "primary right" spoken of is not the transaction of the statute. That is distinct from the immediate elements of the cause of action, since the latter arise out of the former.

8. A circumstance in which two or more persons are concerned, involving two or more remediable rights, constitutes the point of unity at which several possible causes of action may unite.

Two or more causes of action may arise therefrom by violations of two or more of such rights, each right being primary in the sense that when violated the two essential elements of a cause of action constituting a wrong to be remedied exist.

9. When several such violated primary rights have such proximate relation to a major circumstance that it may reasonably be said that in the regular course of events the latter is the source of the former, then several causes of action arise out of such circumstance, within the meaning of the statute, and such circumstance is the transaction of the statute.

10. Any event in which two or more persons are actors, involving a right which may presently, or by what may proximately occur in respect thereto, be violated, creating an actionable wrong, is a transaction within the meaning of the statute. All such wrongs, which in the regular course of events through the rights violated have such proximate relation to that transaction that it may be legitimately said they arise out of it, are redressible in one action regardless of the form of the remedy requisite as to each, providing they affect all the parties and do not require different places of trial.

11. The term "transactions connected with the same subject of action" refers to a different situation than "causes of action arising out of the same transaction." The former applies generally, if not exclusively, to matters which might constitute a source of independent causes of action, yet is so germane to the primary matter, the suit being in equity, as to be regarded really a part thereof.

12. The term "primary right" used as a designation of that which, when violated, will constitute a ground for judicial redress, may in an equitable action include other rights which are also primary in the sense that they might constitute separate grounds of complaint, but which by reason of their relation to the dominant purpose of the suit are deemed to be embodied therein.

13. When a contract between two or more persons on one side and two or more persons on the other creates a situation involving presently or proximately separate rights upon one side, each of which, with a violation thereof by the other side, would constitute a complete ground of complaint for judicial redress, the initial circumstance,—the making of the contract,—is a "transaction," within the meaning of the statute, and such grounds of complaint, should they arise, would be separate "causes of action arising out of the same transaction," within the meaning of the statute.

14. If a person contracts with another to obtain options for that

other to purchase real estate in case he shall upon examination thereof elect to do so, and such person pursuant to his obligation negotiates with a third person to obtain such an option and thereby brings to such other's attention the subject of the transaction in aid of enabling him to obtain the land if he desires to do so, and before a formal option shall have been obtained such other concludes to make the purchase and does so, he thereby becomes liable to such person as upon a full performance of his agreement.

[Syllabus by MARSHALL, J.]

APPEALS from orders of the circuit court for Ashland county: JOHN K. PARISH, Circuit Judge. *Affirmed.*

The following is the substance of those parts of the complaint necessary to be examined in deciding the questions raised by the appeal:

(1) February 5, 1901, plaintiffs, by an agreement in writing with defendants *Thomas E. Nash* and *Guy Nash,* which which will be denominated hereafter the original contract, bound themselves to convey to said defendants, at their option, on or before April 15, 1901, certain specified lands in Ashland county, Wisconsin, at $5 per acre cash, the seller to furnish complete abstracts of title before sale.

(2) Plaintiffs therein also agreed to use their best ability to obtain for such defendants all lands in townships 40 and 41, ranges 3 and 4, and the west one-half of range 2 west, in Ashland, Sawyer, and Price counties, on which the former had options, which the latter should elect to buy at the net option price, or such better terms as could be secured of the owners, plus five per cent. to be paid said plaintiffs for their services and expenses; and further agreed to use their best endeavors to obtain the necessary extensions of such options to enable said defendants to inspect the lands, and to procure abstracts of such lands without expense to the defendants; copies of which options were attached to the contract and marked "A," "B," "D," and "E."

(3) Plaintiffs further therein agreed to serve the said defendants to the best of their ability for two years, if neces-

sary, in procuring options in their names, for the benefit of
and on the best terms obtainable for said defendants, on all
other lands in towns 41 and 42, in ranges 3 and 4, and the
west half of range 2 west in Ashland county; the north two-
thirds of town 40, ranges 3 and 4 west.in Sawyer county; the
north two-thirds of town 40 of the west half of range 2 west
in Price county; said defendants to pay five per cent. commis-
sion on the purchase price of all lands which they should
elect to accept.   Such price to include cost of procuring orig-
inal and tax titles when both were required, the cost of legal
services and court and officers' fees to be borne by said defend-
ants where the plaintiffs should be unable to get the vendors
to bear the same.

(4) June 15, 1901, the time for said defendants to elect
under the options was extended to September 1, 1901.

(5) Before September 1, 1901, the price for the lands men-
tioned in paragraph 1 was reduced to $4.50 per acre.

(6) About September 1, 1901, said defendants elected to
take said lands mentioned, and a binding contract in respect
thereto was made.

(7) Thereafter and before September 26, 1901, said de-
fendants assigned to defendants *James B. Nash* and *William
F. Vilas* a one-half interest in the completed contract afore-
said, so that it subsisted between plaintiffs on one side and
all of the defendants herein on the other.

(8) About September 26, 1901, to correct errors in the
original contract and enlarge its scope, plaintiffs and defend-
ants made articles of agreement which thereafter with said
contract as corrected constituted and were treated as one entire
agreement.

(9) By the first of said articles it was provided that the
completed contract of purchase should embrace certain speci-
fied lands in town 41, ranges 2 and 3 west, and town 42,
range 2 west.

(10) Therein by the second article it was agreed by the

plaintiffs to sell and convey by deed with full covenants to said defendants, if the latter should so elect within ninety days, at $3.50 per acre, the seller to furnish abstracts of title, certain specified lands in Ashland county, Wisconsin.

(11) Therein by the third article plaintiffs agreed for $2.50 per acre to sell and convey to said defendants, by deed with full covenants, and to furnish abstracts of title, if the latter should so elect within ninety days, certain specified lands in Ashland county, Wisconsin.

(12) Therein by the fourth article plaintiffs agreed to likewise sell and convey to defendants, if they should elect within ninety days, certain lands in township 41, range 4 in Ashland county, Wisconsin, at $90 per forty, subject to taxes of 1898, 1899, and 1900, and to furnish abstracts of title at the expense of said defendants.

(13) Therein by the fifth article it was stipulated that the second, third, and fourth articles should be deemed independent agreements, and so far as defendants should elect to buy lands mentioned in any of such articles, they should pay in addition to the price per acre agreed upon, and at the time of the payment thereof, five per cent. as additional consideration.

(15) Said articles of agreement acknowledged payment of $7,500 on lands in article 1, and $26,600 on lands that might be taken under any of the articles, any excess over the purchase price for lands taken to be repaid with interest from the date of the advancement.

(16 and 18) It was further agreed in such articles that plaintiff should by such lawful means as might be necessary procure the title to be vested in defendants to all lands mentioned in article 1.

(17) In order to comply with that obligation and to secure performance of all agreements and covenants on their part, plaintiffs agreed to and did deliver to defendants their deeds of conveyance with full covenants covering certain specified lands.

(19) Plaintiffs further agreed in such articles to likewise deliver deeds of lands mentioned in the fourth of said articles within ten days after procuring title thereto.

(20) It was therein further agreed as to the deeds so delivered as security that the acceptance thereof should not be deemed an exercise of the option to purchase lands described therein, but that upon the exercise of such option said deeds should be deemed absolute.

(21) It was therein further agreed that so fast as the title to lands mentioned in the first article should be perfected in said defendants, the stipulated price therefor should be deemed paid out of the money advanced by the defendants as aforesaid, and that when the entire advancement of $34,100 should thus have become applied, including the application of any part to lands described in articles 2, 3, and 4, if defendants should have elected to buy any of such lands, then there should become due plaintiffs, as fast as they should perfect title to more of said lands described in said first article, the like ratable price as agreed upon, the same to be paid as the same should become due, subject, however, to the performance of all plaintiffs' agreements contained in said articles, as security for which defendants were privileged to retain a reasonable amount thereof.

(22) Plaintiffs therein further agreed to perfect title in said defendants to the lands mentioned in the first article as speedily as possible, and that if any were not so treated within two years, the rights of parties should be adjusted and any sum due from one side to the other be paid.

(23) It was therein further agreed that upon a settlement being made between the parties at any time, plaintiffs having fully performed their obligations and defendants elected not to exercise their option as to any of the lands conveyed to them as security, the same should be reconveyed.

(24) It was therein further agreed that if defendants elected to buy any of the lands mentioned in the second, third,

or fourth of such articles they should be liable for the taxes thereon of 1901.

(25) November 18, 1901, defendants duly elected to purchase the lands mentioned in articles 2 and 3, and the prior deeds thereof to them thereupon became absolute. About December 20, 1901, all agreements in respect thereto on plaintiffs' part were fully performed, whereupon the purchase price of the lands according to the contract, being $2,000 and five per cent. additional, became due to them.

(26) About December 20, 1901, said defendants duly elected to purchase the lands described in the fourth article. On January 10, 1902, plaintiffs fully performed all their obligations in respect thereto, whereupon there became due to them under said articles $1,800, and five per cent. thereof and of the $278.18 taxes paid by defendants, and $17.50, cost of abstract; in all $1,921.41.

(27) Plaintiffs performed all their obligations under the written contract and articles, and caused to be vested in defendants, prior to January 15, 1902, title to all lands mentioned in article 1, except 320 acres.

(28) About January 15, 1902, plaintiffs furnished defendants abstracts of title showing the facts last alleged.

(29) By reason of such facts there became due to plaintiffs by January 15, 1902, for lands mentioned in article 1, $52,464.25.

(30) About the date last mentioned defendants refused to pay any further sum on any of the lands, but induced plaintiffs to believe that if they would obtain a judgment quieting title as to certain alleged adverse claims, which did not exist in fact, they would fully perform their part.

(31) By reason of such inducement, plaintiffs, by due course of law, obtained a judgment as to such alleged adverse claims, and obtained quitclaim deeds as to some of them.

(32) About April 24, 1902, plaintiffs caused abstracts of title to the lands mentioned in article 1 to be brought down to

date, and delivered the same with a certified copy of the aforesaid judgment to defendants, and demanded payment of the money then due upon such original contract and articles.

(33) Ample time was given defendants to pass on said abstracts after said April 24th, but they refused to pay plaintiffs any part of what was then due.

(34) April 25, 1902, plaintiffs finally perfected title in defendants to all of the lands mentioned in article 1.

(35) June 14, 1902, plaintiffs delivered to defendants abstracts of title showing the facts aforesaid, whereby there became due to the former for the 320 acres of land aforesaid, $1,440, and the whole purchase price of the land mentioned in articles 1, 2, 3, and 4, not previously due, also then became due.

(36) About June 5, 1902, all deeds from defendants to plaintiffs, or procured by the former to be given to the latter, were duly delivered to the register of deeds of Ashland county, Wisconsin, for record, and were duly recorded, since which time defendants have asserted ownership to all lands affected by such deeds.

(37) After opportunity was given defendants to examine the abstracts as stated, plaintiffs to further satisfy said defendants, at their request, caused new abstracts of title to be prepared by their own agent and performed other acts to the end that all complaints on their part in respect to the title might be removed, which new abstracts were accepted by defendants before November 30, 1902.

(40) There is due plaintiffs from defendants under the terms of the original contract and articles, after allowing for all advances and all other proper credits, a balance of $23,516.33.

(41) The amount stated became due for lands mentioned in articles 1, 2, 3, and 4, and plaintiffs are entitled to a lien thereon to secure the payment of said sum. The value of said lands consists, in the main, of timber thereon, which defend-

ants, unless enjoined by the court, will cut and remove, thereby impairing the said right of lien.

(42) August 6, 1901, defendants duly elected, under said original contract and articles, to purchase the lands mentioned in the option referred to in the articles as Exhibit A for $7,512, whereby there became due to plaintiffs a commission thereon of five per cent., less a part thereof received from the grantors, the balance being $200.

(43) February 8, 1901, pursuant to said original contract, plaintiffs arranged for the purchase by the defendants, at their option, of certain lands in Ashland county, which pursuant to such contract and such arrangement defendants purchased for $2,692.70, whereby they became indebted to the plaintiffs for $135.64 as a five per cent. commission.

(44) Further pursuant thereto, February 8, 1901, plaintiffs procured an option for defendants on lands known as the Swift lands, which was thereafter exercised at $2,880, whereby they became indebted to plaintiffs for $144 as commission.

(45) Further pursuant thereto said defendants elected to purchase lands under the option referred to as Exhibit B, and the contract was fully consummated by vesting the title to said lands in said defendants for $4,860, whereby there became due to the plaintiffs under such original contract $243 as commission.

(46) Further pursuant thereto about December 16, 1901, defendants elected to take the lands referred to in such option, Exhibit B, and the title thereto was vested in them for $1,400, whereby under said original contract there became due plaintiffs $70 as commission.

(47) Further pursuant thereto, February 8, 1901, plaintiffs commenced negotiations to obtain for defendants options to purchase lands in Sawyer county, known as the Mississippi River Logging Company lands, and thereafter served defendants to that end with the result that July 9, 1902, they be-

came owners of said lands for $17,600, whereby there became due to plaintiffs from defendants, under said original contract, $880 commission.

(50) There is due plaintiffs from defendants under the terms of said original contract, as commission, $1,671.64, with legal interest as follows:

On $200, from August 6, 1901.

On $134.64, from November 10, 1901.

On $144, from November 15, 1901.

On $243, from December 15, 1901.

On $70, from December 16, 1901.

On $880, from July 9, 1902.

Judgment was demanded as follows:

1. For $23,516.33, as purchase money of lands in articles 1, 2, 3, and 4, with interest as claimed.

2. That the same, with costs, be adjudged a lien on such lands, to be enforcible as the court might direct.

3. That defendants be enjoined, pending the litigation, from conveying any of the lands to third persons or impairing the value thereof.

4. For $1,671.38, for the commissions aforesaid, with the interest thereon as stated.

5. For such other and further relief as the court may deem proper.

The defendants *James B. Nash* and *William F. Vilas* demurred to the complaint, first for insufficiency, second for improperly uniting several causes of action, third for insufficiency of facts as to the first cause of action attempted to be set forth, fourth for insufficiency of facts as to the cause of action attempted to be set forth in paragraph 42, also as to that attempted to be set forth in paragraph 43, also as to that attempted to be set forth in paragraph 44, also as to that attempted to be set forth in paragraph 45, also as to that attempted to be set forth in paragraph 46, also as to that attempted to be set forth in paragraph 47.

The defendants *Thomas E. Nash* and *Guy Nash* demurred to the complaint upon the ground above stated.

The demurrers were overruled. From the orders accordingly entered an appeal was taken to this court by defendants *Thomas E. Nash* and *Guy Nash,* and an appeal was likewise taken by defendants *James B. Nash* and *William F. Vilas.*

*Burr W. Jones,* for the appellants.

For the respondents there were briefs by *J. W. Hicks* and *James O'Leary,* attorneys, and *Reid, Smart & Curlis,* of counsel, and oral argument by *J. W. Hicks* and *James O'Leary.*

MARSHALL, J. We have examined with care the very able analysis of the complaint by appellants' counsel without being able to reach the conclusion they contend for. The case is by no means clear, and if it were proper to incline to a view which would condemn the pleading because such view is reasonable, there being another such view that will sustain it, a conclusion might be arrived at fatal to the orders appealed from.

We cannot too often recur to the radical change wrought by the Code from the common-law rule for determining the sufficiency of pleadings. It must not be forgotten that he who challenges a pleading for insufficiency in any respect cannot rely for success upon mere failure to state expressly or clearly facts essential to sustain it,—not in case of conflicting reasonable inferences upon that one being adopted supporting his contention. Formerly, mere ambiguity, resolvable reasonably in a way to defeat a pleading, was sufficient to that end upon the matter in that regard being presented on demurrer. The pleading was required to stand the test of every reasonable intendment and presumption against it. *Morse v. Gilman,* 16 Wis. 504. That was one of the serious obstacles to the speedy, economical, and efficient administration of justice, which the Code was designed to remove. Because of the inclination of

many judges against invasions of the ancient methods of pre-
·senting controversies for judicial determination, early mani-
fested after the adoption of the new system, in respect thereto,
which has never been wholly changed, though the new system
is over half a century old, the full scope of the reform wrought
thereby is not yet universally fully appreciated.

"In the construction of a pleading for the purpose of deter-
mining its effect its allegations shall be liberally construed,
with a view to substantial justice between the parties." Sec.
·2668, Stats. 1898.

"The court shall, in every stage of an action, ·disregard any
·error or defect in the pleadings or proceedings which shall not
affect the substantial rights of the adverse party." Sec. 2829,
,Stats. 1898.

That language is unmistakable. Together with the whole
framework of the Code it shows that the guiding thought of
the reformers was that the attainment of justice, the end
·sought in all litigation, should be wholly free from all inter-
ferences in the nature of mere technicalities and illiberal con-
·structions. In harmony with that the statute was very early
.given a broad and liberal construction to the end that the be-
neficent purposes thereof might be fully realized. This court
·declared that "every reasonable intendment and presumption
is to be made in favor of a pleading."

"A complaint to be overthrown by a demurrer or objection
to evidence, must be wholly insufficient. If in any portion
of it, or to any extent, it presents facts sufficient to constitute
a cause of action, or if a good cause of action can be gathered
from it, it will stand, however inartificially these facts may
be presented, or however defective, uncertain or redundant
may be the mode of their statement." *Morse v. Gilman, supra.*

Notwithstanding that plain declaration so early made, it
.has not always been appreciated and applied by judges, and
it has often been lost sight of by counsel in the presentation of
·causes on appeal. The phrasing of the statutory rule by
DIXON, C. J., which we have given, has not been materially

improved upon in the numerous elaborations thereof found in our decisions, though, perhaps, it has been thereby re-enforced. In *Miller v. Bayer,* 94 Wis. 123, 68 N. W. 869, the court said, in effect, that the true test to apply to a pleading is, Will the language used permit of a reasonable construction which will sustain it? In *Ean v. C., M. & St. P. R. Co.* 95 Wis. 69, 69 N. W. 997, it was said, in effect, that for the purpose of sustaining a pleading it should have the support of the most liberal construction which its language will reasonably bear, and all reasonable inferences that can be drawn therefrom. Again the court said, substantially, in *Kliefoth v. N. W. I. Co.* 98 Wis. 495, 74 N. W. 356, that effect should be given to all allegations of a pleading which will support rather than defeat it, if that can be done without adding thereto, by way of construction, material words not necessarily implied, or giving to the language used a meaning that cannot be reasonably attributed to it. And again in *Miles v. Mut. R. F. L. Asso.* 108 Wis. 421, 427, 84 N. W. 159, 162, the court said:

"Criticisms of a pleading will not support a challenge for insufficiency to state a cause of action or defense, if sufficiency can be discovered reasonably by judicial construction of the language used and by reasonable inferences from general allegations. Such pleadings may be open to a challenge for uncertainty and indefiniteness, but not insufficiency."

And recently in *Manning v. School Dist. No. 6, ante,* p. 84, 102 N. W. 356: Every pleading is to be so construed as to support the purposes of the pleader to state a cause of action, if the facts essential thereto can be found expressly stated or alleged by reasonable inference, looking at the language in its full reasonable scope.

In view of the foregoing it seems plain that it would be a waste of time to follow the analysis of the complaint made by the learned counsel for appellants to see whether the pleading will reasonably permit of the construction they contend

for. All might be conceded that is claimed in that regard, and it might be conceded, too, that so viewing the pleading it is fatally defective, without necessarily arriving at a right determination of the controversy now presented, since, as we have seen, the only legitimate test to be applied to the complaint is, Will it reasonably permit of a construction sustaining it? In view of all the facts alleged expressly or by reasonable inference, is the pleading bad as claimed? If it will satisfy such test it is good on demurrer, as indicated, however plainly it may be open to a motion for indefiniteness and uncertainty.

The main contention of appellants' counsel is that the complaint is bad because of misjoinder of causes of action. That involves a concession that there are two or more good causes of action stated (*Bassett v. Warner*, 23 Wis. 673; *Koepke v. Winterfield*, 116 Wis. 44, 92 N. W. 437), but that they are not such as can be united under sec. 2647; Stats. 1898. For the purposes of the discussion it may be taken for granted that the pleading does state several causes of action, that one is equitable to enforce a vendor's lien, while the others are legal. They are, nevertheless, properly joined if they "arise out of the same transaction or transactions connected with the same subject of action," affect all of the parties to the action, and do not require different places of trial. Sec. 2647, Stats. 1898. There can be and is no controversy but that all of the causes of action, if there be more than one, are triable at the same place. Therefore, we may confine our investigation to whether they arise out of the same "transaction or transactions connected with the same subject of action" and affect all the parties.

It would be very helpful in arriving at a correct conclusion if the learned counsel for appellants had given earnest attention to the meaning of the term "transaction" in sec. 2647 of the Statutes. The reluctance of courts to grapple with doubtful matters, or matters supposed to be doubtful, even when

so presented as to afford a perfectly legitimate opportunity for solving the same and blazing out a plain pathway for the bar and trial bench to follow, in the absence of necessity for action in that regard, is by no circumstance better illustrated than the one that, though the term mentioned has been significantly in use in Codes for nearly sixty years, it has not been judicially construed with such a degree of definiteness as to furnish any plain rule to go by. In *New York & N. H. R. Co. v. Schuyler,* 17 N. Y. 592, COMSTOCK, J., after a careful consideration of the matter, confessed inability to suggest a construction of the term filling all situations, independently of the discretion of the trial judge as to what under the circumstances in hand will best promote the ends of justice. He remarked:

"Its language is, I think, well chosen for the purpose intended, because it is so obscure and so general as to justify the interpretations which shall be found most convenient and best calculated to promote the ends of justice. It is certainly impossible to extract from a provision so loose and yet so comprehensive any rules less liberal than those which have long prevailed in courts of equity."

In *Keep v. Kaufman,* 56 N. Y. 332, another learned justice confessing the same situation said, apparently in a spirit of lamentation, "There are few rules of pleading in force." No material improvement upon the futile effort of Justice COMSTOCK to construe the statute can be found in the New York decisions. Very little light is thrown on the subject, other than by the application of the statute to the facts of particular cases. In no one that we can discover has any attempt been made to lay down a comprehensive rule. Without one it is not strange that there are many seeming inconsistencies in decisions, nor strange that in New York in the statute relating to the joinder of actions the word "transaction" has not been applied consistently with the same word in the statute on the subject of counterclaims.

The text-writers all note the failure of courts to meet

squarely and solve the situation above indicated. In 1 Ency. Pl. & Pr. 185, it is said, "No satisfactory definition has been given to the term 'transaction.'" In Bliss, Code Pleading, with considerable hesitancy, a construction of the statute is suggested, the author saying, "Its full and exact scope does not seem to have been judicially considered." § 126. In Maxwell, Code Pleading, at page 343, the author says, "No definition of the word 'transaction' has been attempted by any court as far as I am aware." In Baylies, Code Pl. & Pr. (2d ed.) at page 157, the author said:

"The language of this provision is very general and very indefinite. The judges have taxed their ingenuity to invent a rule for determining what the 'same transaction' means."

He indicates very clearly a conclusion that all such efforts have been well-nigh fruitless, referring significantly to this expression of CHURCH, C. J., in *Wiles v. Suydam*, 64 N. Y. 173, 177:

"This language is very general and very indefinite. I have examined the various authorities upon this clause, and I am satisfied that it is impracticable to lay down a general rule which will serve as an accurate guide for future cases. It is safer for courts to pass upon the question as each case is presented."

In Pomeroy, Code Rem. (4th ed.) §§ 357–370 (*463–*476), the author appears to have made a more earnest, and perhaps a more successful, effort than had been theretofore or has since been made to lay down some definite rule,—freely confessing, however, the difficulty in the way by reason of the dearth of satisfactory authority, and deploring the judicial habit of unwillingness to attempt the discussion and settlement of definitions, principles, and doctrines connected with the reformed procedure in a general and comprehensive form, which has resulted in leaving such difficulty so long unsolved.

We cannot expect to do fully what all the text-writers and jurists have avoided doing since 1852, when the term

"causes of action arising out of the same transaction or transactions connected with the same subject of action," was coined and made a part of Code systems of jurisprudence. This is an occasion, in the judgment of the writer, when that valuable service to the bench and bar might be legitimately performed. If it had now been, or at any time in the future should be, determined to remove, so far as possible, uncertainty respecting the matter, the writer would not hesitate to take up the work of speaking for the court to that end, though the difficulty to be overcome, in view of the general attitude on the subject, as before indicated, it is believed is fully appreciated. So far as opportunities are afforded therefor the law should be made as plain as judicial labor can reasonably make it. Especially in matters of practice it is better that uncertainties in ambiguous legislation should be removed by definite judicial determinations in the form or effect of plain rules, even if the precise thought of the statute makers is not thereby made effective, than that trial courts and the profession should be left to be guided by mere precedents of the application of the statute to particular circumstances.

Some general observations as to the meaning of the word "transaction" in the statute under consideration will suffice for this case. Prof. Pomeroy initiated his treatment of the subject, at sec. 357, with the statement "the words of the statute are broad, comprehensive, vague, and uncertain," but believing, as he said, that to leave the matter where Justice Comstock did in *New York & N. H. R. Co. v. Schuyler, supra,* though the easiest way for the courts, so far fails to render efficient what the legislature intended as to be unjust to suitors and the profession, he proceeded to lend the aid of his learning in the matter. His reasoning is logical and his conclusions have met with much favor, though they have not, so far as we are aware, been adopted as judicial rules. We

approve thereof, generally speaking, and what we say is in harmony therewith.

The statute plainly suggests that out of one circumstance in its entirety involving two or more persons, denominated a transaction, there may result two or more remediable primary rights. It follows necessarily that the legislative idea is that in such primary or major circumstance the minor circumstances, the several rights, meet. At the point of union we have the transaction of the statute. However numerous may be the minor transactions, each constituting a primary right enforcible by the proper remedy, so long as they all reach back to the point of union as the parent cause thereof,— the connection between such point of unity and the various results enforcible as separate grounds for complaint being sufficiently close that the former can clearly be seen to be the proximate cause, so to speak, of the latter,—they all grow or arise out of one transaction, within the meaning of the statute, and may be vindicated together, each by its proper remedy, subject to the proviso at the close of sec. 2647.

A good illustration of the foregoing is found in the recent decision of this court in *Gutzman v. Clancy,* 114 Wis. 589, 90 N. W. 1081. There it was held that in case of a mutual assault the remedial rights of each of the combatants against the other arise out of a single transaction, within the meaning of the statute, and can be vindicated in the same suit, the defendant counterclaiming against the plaintiff's cause of action. Among the earlier cases is *Adams v. Bissell,* 28 Barb. 382. Prof. Pomeroy dignifies it by quoting the opinion of Justice SUTHERLAND in full. The defendants, as common carriers, contracted to transport to the city of New York and deliver to plaintiffs, as consignees, a quantity of wheat. The latter, as owners of the bill of lading, made advances on the grain. When the delivery was made there was a shortage of 340 bushels. Not knowing thereof before paying the freight, the consignees overpaid in that regard to the amount of $170.

They sued the carrier, joining in the complaint a cause of action for converting the 340 bushels of wheat and a cause of action to recover the $170 overpaid. The court held that the joinder was proper because the contract for the transportation was the transaction out of which the two° rights of action arose. The discussion by the learned justice who wrote the opinion, of the clause "transactions connected with the same subject of action," wherein he referred to it as mere surplusage, seems rightly characterized by Prof. Pomeroy as unsound. *Jones v. Steamship Cortes,* 17 Cal. 487, is another illustrative case commonly referred to by text-writers. Plaintiff, through the fault of the owners of the steamship Cortes, was induced to purchase a ticket for passage for San Juan, supposing that the ship would land at that place, but it did not and she was carried to Panama, whereby she was subjected to pecuniary loss and to personal discomfort and injuries. It was held that all remedial rights arising in plaintiff's favor grew out of the transaction whereby she was induced to purchase a ticket for passage on the ship, and that the various causes of action were joinable.

Any number of other illustrations might be given. No considerable aid can be obtained by a further citation of precedents. It is the common opinion of writers that an extended discussion of them rather tends to confuse than enlighten. It is believed that the difficulty, referred to so many times in the books, of understanding the real thought intended to be expressed by the Code makers lies largely in the indisposition of judges to take kindly to the Code system of pleading, rather than to any real ambiguity in the words used. A cause of action consists of those facts as to two or more persons entitling at least some one of them to a judicial remedy of some sort against the other, or others, for the redress or prevention of a wrong. It is essential to the existence of such facts that there should be a right to be violated and a violation thereof. Since those two elements constitute a cause of

action, and to satisfy the statute they must arise out of one or more circumstances called a transaction, the latter is to be viewed as something distinct from the cause of action itself, else the latter could not arise out of the former. The occurrence of the transaction and of the facts constituting the cause of action may be simultaneous or not. A. enters into a contract with B. Out of that circumstance grows the right of each against the other to the performance of the contract. That right is the first essential or step to the creation of a cause of action. It necessarily must precede the existence of such cause. Subsequently that right is violated. In that we have the final essential or step to the creation of the cause of action. There may be several such rights and several such violations, hence, necessarily, several such causes of action, produced each by minor circumstances, each set thereof reaching back to the major transaction in which they unite and from which they arise in the regular course of events. Going back from one completed cause of action to the point of unity and thence to another such cause we discover the proximate relation between them. The cause or circumstance upon which all depend is the transaction of the statute. All the causes of action, within the meaning of the statute, arise out of that. The major transaction may occur long prior to the violation of the right constituting the last step completing any one of the various causes of action. It is easily comprehended that in one circumstance in its entirety there may exist two or more rights and that there may be distinct invasions thereof, each invasion of itself constituting a separate wrong redressible by the remedy appropriate thereto.

Giving to the words of the statute their plain ordinary meaning in view of the situation with which the builders of the new system had to deal, the meaning thereof does not seem to be very obscure. If it were not for its having been repeatedly characterized as ambiguous in a high degree we should feel warranted in saying that its meaning is plain.

Any event in which two or more persons are actors, involving a right which may presently or by what may proximately occur in respect thereto be violated, creating a redressible wrong, is a transaction within the meaning of the statute. All such wrongs which, in the regular course of events, through the rights violated, have such proximate relation to that transaction that it can be legitimately said they arise out of it are redressible in one action, regardless of the form of the remedy required as to each, subject to the proviso of the statute before referred to.

The foregoing analysis of the statute goes far enough for the purposes of this case. We do not need to consider the meaning of the term "transactions connected with the same subject of action," though in passing we may say again that it is not mere surplusage, as suggested in *Adams v. Bissell,* 28 Barb. 382. It covers a different situation than that referred to by the term "causes arising out of the same transaction." Manifestly, there may be such cause and others arising out of transactions connected with the subject thereof, yet the latter not arise out of the transaction first spoken of nor out of such subject. Doubtless, as has been said by text-writers and judges, the second clause of the statute applies more generally, if not exclusively, to equitable suits.

In view of the foregoing, unless we can discover in the complaint the existence of some primary transaction creating directly or proximately the several distinct rights alleged to have been violated, the demurrer for misjoinder should have been sustained.

At the outset it is alleged that February 8, 1901, "plaintiffs *John W. Emerson* and *David W. Emerson* entered into an agreement in writing with *Thomas E. Nash* and *Guy Nash,*" in which the former obligated themselves in several distinct particulars to the latter, who in consideration therefor obligated themselves as to each such particular to the former. Manifestly, the mutual obligations as to each such matter cre-

ated corresponding rights to performance, and failure by either party, upon that being due to the other, constituted a remediable wrong and a cause of action arising out of the transaction creating the right itself, to wit, the contract of February 8, 1901. Each such right formed a step toward a possible cause of action, which required only an invasion of it to complete the same.

It is further alleged that September 26, 1901, for the purpose, among other things, of enlarging the scope and amending the terms of said original contract, "plaintiffs *John W. Emerson* and *David W. Emerson,* on the one side, and the defendants *Thomas E. Nash, Guy Nash, James B. Nash,* and *William F. Vilas,* on the other side, made and entered into certain written articles of agreement under their hands and seals, hereinafter designated as 'articles of agreement,' and that except as amended and modified by said articles of agreement, the said original contract remained in full force and effect, and that thereafter the said original contract and articles of agreement constituted and were treated by the plaintiffs and defendants as one contract." There seems to be a pretty plain statement that the second agreement was but a mere modification and enlargement of the first, whereby all of the parties became mutually obligated as to all particulars of the entire agreement. Excluding from consideration the concluding words of that part of the paragraph commencing with "and that except as amended," etc., still we have a fairly plain statement that the first contract was merely extended and changed by the second transaction, leaving but one entire agreement in which plaintiffs stood for all the obligations on one side and defendants jointly stood for all those on the other. Note the significance of the expression in that regard, "*John W. Emerson* and *David W. Emerson, on the one side,* and the defendants *Thomas E. Nash, Guy Nash, James B. Nash,* and *William F. Vilas, on the other side,* made and entered into," etc. It needed no additional language to show that those parts of

the first agreement not inconsistent with the supplement thereto were preserved as parts of one agreement, which included the amendatory part of the contract of September 26, 1901. The language to the effect that the first transaction and the second constituted one contract and were by all parties so treated ever after the occurrence of the latter, really does not add anything to what preceded it, other than an indication of what the pleader intended theretofore to state. Perhaps in that regard it strengthens such language. However, it seems without any such reinforcement, by reasonable inference at least, the language of the pleader shows he intended to and did state that by the occurrence of September 26th, that of February 8, 1901, was amended and broadened so that the plaintiffs obligated themselves as parties on one side of the amended agreement, and all of the defendants obligated themselves as parties on the other as to all matters involved. The language used is too comprehensive, as it seems, to permit us to hold that it neither states expressly nor by reasonable inference that the two transactions were merged into one, with mutual obligations as to all particulars affecting all the parties, unless there is something later in the pleading so inconsistent therewith as to change that appearance.

The result up to this point indicates that all rights created in plaintiffs' favor by the entire contract,—the amended agreement of September 26, 1901, embracing all the matters material to this case included in the transaction of February 8, 1901,—relate to one transaction, and the violations of such rights, alleged, created separate causes of action legitimately arising therefrom, within the meaning of the statute.

The point is made that the option mentioned in the first clause of the complaint was accepted by *Thomas E. Nash* and *Guy Nash* prior to the occurrence of September 26, 1901, and that thereby that part of the original contract became a completed independent agreement, creating a new primary right, itself a subject of a cause of action contingent upon a

violation thereof, and which could not arise out of the transaction of later date, to wit, that of September 26, 1901. In this it seems that counsel make the mistake of supposing that the vindication of the right under the completed feature of the original contract is not enforcible in company with others created by such contract, because it is primary in the sense that it with a violation thereof constitutes a complete cause of action. That use of such term should not be mistaken for the use when applied to the dominant right in a bill in equity, which may draw a multitude of other matters, each sufficient to form a cause of action, so closely to it that the whole is said to constitute a single cause of action. *Zinc C. Co. v. First Nat. Bank,* 103 Wis. 139, 79 N. W. 229; *South Bend C. P. Co. v. Geo. C. Cribb Co.* 105 Wis. 443, 81 N. W. 675; *Gager v. Marsden,* 101 Wis. 598, 77 N. W. 922. It is no objection to the joinder of causes of action that they concern separate primary rights,—none whatever. If that were not so there could be no such thing as the joining of several causes of action in one suit, since each such cause must necessarily involve in a sense a single such right. If all such causes arise out of the same transaction, or transactions connected with the same subject of action, that is sufficient.

While it is true it is alleged that *Thomas E. Nash* and *Guy Nash,* prior to September 26, 1901, bound themselves absolutely to plaintiffs to purchase and pay for part of the land mentioned in the original contract, the subcontract grew out of the original transaction and was executory at the time of the occurrence of September 26, 1901. It created a primary right in the sense that it made what was theretofore optional on one side, absolute so that the invasion of it constituted a cause of action, but not in the sense that it was so disconnected with the parent contract that a cause of action to enforce it could not be reasonably said to arise out of the latter as embodied in the transaction of September 26, 1901. It is considered that since before the subcontract was violated it be-

came subsidiary to the amended contract, which contained mutual obligations binding on all parties on one side to all the parties on the other as to the whole matter, the completed cause of action to vindicate it arose out of the relations existing between all the parties under such amended contract.

It may be that one might reasonably construe the pleading so as to render the so-called completed contract so disconnected with the transaction of September 26th that the cause of action to enforce it could not well be said to arise out of the latter transaction.  True, the allegation that *"Thomas E. Nash* and *Guy Nash* duly sold, transferred, and assigned to *James B. Nash* and *William F. Vilas* an undivided one-half interest in said completed contract of purchase, *so that the same* then subsisted between the plaintiffs *John W. Emerson* and *David W. Emerson* on the one side and the defendants *Thomas E. Nash, Guy Nash, James B. Nash,* and *William F. Vilas* on the other side,"* might be true in the sense that the executory vendees thereby became jointly entitled to enforce the contract against the executory vendors, upon putting the latter in default,—and such vendors be not entitled to enforce the contract against such vendees.  If there were a mere assignment of a one-half interest in the completed contract, no mutual obligations were created in respect to the matter as to all the parties.  But it was perfectly competent for the assignors and assignees to make their transaction in such form as to put the latter in the same position as to the executory vendors as the assignors.  That was the most natural thing to do under the circumstances.  It is considered that the allegation of the complaint in regard to the assignment, in connection with what immediately follows as to the change in the original contract, fairly states that as what the parties did do.  It is significant that the assignment and the enlargement of the general contract occurred at the same time, apparently as parts of one transaction, and that the allegation as to the nature of the former is in harmony with that as to

how the parties dealt in respect to the latter. It is alleged that plaintiffs as one party contracted with all the defendants as the other party, suggesting the creation of mutual obligations affecting all. It should be further noted that the allegation as to the assignment does not state that *Thomas E. Nash* and *Guy Nash* assigned an undivided one-half interest in the contract to *James B. Nash* and *William F. Vilas,* and that all thereby became contractors on one side with the plaintiffs on the other, but the statement is that the assignment was *made "so that the same subsisted between the plaintiffs,"* or in other words became a contract between the plaintiffs "on one side" and all the defendants "on the other side." It was competent to thus plead the facts according to their legal effect, and we must incline to the view that they were so pleaded, since that is reasonable, rather than adopt another view which is unfavorable to the pleader. The view we take of the allegations as to the transaction of September 26, 1901, puts all the defendants in the same relation to the plaintiffs and renders the invasion of every distinct separable right created thereby the final step in a cause of action arising proximately, at least, out of one transaction commenced February 8, 1901, and completed September 26, 1901.

What has been said leads logically to a disproval of the contention that the causes of action, so called, stated in paragraphs 42 to 47, inclusive, of the complaint, each being for compensation for services performed under the terms of the contract as made February 8, 1901, embraced, as we have seen, in that of September 26, 1901, cannot be joined with the same cause of action already discussed. All arise in the statutory sense out of one transaction. In discussing this branch of the case the learned counsel for appellants appear to confuse the term "primary right" with the term "transaction." They say, "It is respectfully submitted that there is no sort of chance to contend that the first cause of action arises from the same primary right which is asserted as a basis for

the other six." If what one would ordinarily understand by that is what counsel mean, they are in error. Causes of action are not joinable because they arise out of the same primary right, but because they arise out of the same transaction.

What has been said renders it unnecessary to discuss the question of whether all of the causes of action affect all the parties to the action. The affirmative of that proposition is the logical effect of what has already been said.

It is contended that the second cause of action, so called, the one stated in subdivision 42 of the complaint, is not sustainable because it is nowhere alleged that all the defendants became parties to the agreement to pay commissions upon the purchase price of the lands therein mentioned. From the conclusion we have reached that the original contract to pay plaintiffs commissions became incorporated into the agreement of September 26, 1901, with mutual obligations as to all the matters referred to in the beginning, and thereafter as well, it follows that we must regard the facts, which appellants' counsel insist are not pleaded, as fairly stated.

What has been said sufficiently disposes of the objection to the causes of action, so called, stated in paragraphs 44 and 45.

We are unable to appreciate the criticism of the cause of action, so called, stated in paragraph 43 of the complaint. It is said that "aiding plaintiffs in obtaining title to lands owned by Ashland county was not within the scope of the first contract." That suggestion, so far as it is based on the circumstance that such contract was originally with but two of the defendants, has been sufficiently met. It is said that county lands were open to any purchaser; that an option to purchase such lands with the privilege of examination, such as respondents agreed to obtain, was not procured, and would not have been legal had it been secured, and that it is not alleged that any such was obtained. The lands mentioned were such as the county had acquired title to with the right to sell the same for cash in the discretion of its governing board. It had the

power to proceed in that regard according to the ordinary method of doing such business.   It is alleged, in effect, that respondents performed services for defendants, under the contract relating to such matters, in procuring for appellants the opportunity°to purchase lands from Ashland county, which were within the territory mentioned in such contract.   That was as well within the terms of such contract as services rendered to a like end regarding lands owned by any other party. It is further alleged that respondents pursuant to the terms of the contract arranged for the purchase of the land if the defendants should so elect, and the latter pursuant to such arrangement, and not otherwise, elected to and did purchase the land.   If plaintiffs so arranged, they obtained an option within the meaning of the contract, and if subsequently appellants elected to and did purchase the land, they obtained the same pursuant to the option.   The contract did not require an option to be obtained in any particular form nor to run any specific period of time.   True, according to the terms of the contract commissions were agreed to be paid to respondents only on the purchase price of lands optioned in their own names in appellants' interest, which the latter, after a proper inspection, elected to purchase, and the agreement necessarily contemplated that the options would provide for time for such inspection.   But if in any case an option was obtained in a good-faith execution of the contract and appellants elected to take under it, they could not successfully resist the demand for the commission because time for a proper examination of the property was not afforded them.

It is contended that the cause of action, so called, stated in subdivision 47 of the complaint cannot be said to arise out of the same transaction as the others, because the contract did not call for any such services as are there spoken of.   We take it that counsel so contend because, whereas under the contract commissions were agreed to be paid plaintiffs upon the purchase price of lands taken under options obtained by them

in their own names for the use of the defendants, it is not alleged that the lands in question were so optioned.   The idea seems to be that, though respondents proceeded in good faith under the contract to obtain options for appellants and expended considerable sums of money in that regard and devoted considerable time thereto and to put appellants in possession of the necessary information to enable them to decide whether to purchase the land or not,—no commission was; earned because the purchase was made without a preliminary binding option as contemplated.   We cannot agree with that.. If, as alleged, respondents negotiated with the owners of the land for the purpose of obtaining an option to enable appellants to purchase the same, and as a result of their time and money devoted to the performance of their obligations appellants accepted the land, they became liable for the commission stipulated for in the contract, regardless of whether there was a formal option and an election to take under it or not. The bringing of the parties together, obtaining for appellants. the opportunity to make the purchase, aiding them to that end till they were satisfied to take the land, and their doing so substantially satisfied every requirement of the contract not waived by appellants.

There is nothing further that need be said.   The general result is that all of the so-called causes of action, including the one for a vendor's lien, affect all of the defendants, and arise out of one transaction embodying the agreement of February 8th, and the addition thereto and change thereof of September 26, 1901, and hence are joinable.

The complaint is by no means a model of conciseness and clearness.   There are ambiguities which might well challenge the attention of the careful practitioner.   If it were proper to measure the allegations of the pleading with a critical eye,. only seeing those facts alleged which are clearly and expressly stated, it probably could not be sustained.   It may be, and possibly is, open to objection for indefiniteness and un-

certainty at several points, but that is not the question here. Viewing it in the light of the liberal rules that must be applied thereto, it seems that the facts essential· to sustain it are alleged expressly or by reasonable inference.. Other inferences could probably be drawn from the pleading which would defeat it, but the favorable inference should prevail. Many of the facts necessary to sustain the pleading, which we hold are stated by reasonable inference, may not exist at all. For the purpose of sustaining it we must assume, under the circumstances, that they do exist.

*By the Court.*—The orders appealed from are affirmed.

WINSLOW, J., dissents..